JUDICIAL WATCH, INC.
ERIC W. LEE (SBN 327002)
ROBERT PATRICK STICHT (SBN 138586)
425 Third Street, SW, Suite 800
Washington, D.C. 20024
elee@judicialwatch.org
rsticht@judicialwatch.org
Telephone: (202) 646-5172

BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
1301 Dove Street, 5th Floor
Newport Beach, CA 92660
Telephone: (916) 447-4900
brad@benbrooklawgroup.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| DON WAGNER, and THE AMERICAN INDEPENDENT PARTY OF CALIFORNIA,<br><br>Plaintiffs,<br>v.<br><br>SHIRLEY N. WEBER, in her official capacity as California Secretary of State,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs Don Wagner and the American Independent Party of California file this Complaint for Declaratory and Injunctive Relief against Defendant Shirley N. Weber, in her official capacity as the California Secretary of State.

1. Plaintiffs seek declaratory and injunctive relief to compel Defendant to comply with their voter list maintenance obligations under Section 8 of the National Voter Registration Act of 1993 ("NVRA" or "Act"), 52 U.S.C. § 20507. Plaintiffs also seek reasonable attorneys' fees, litigation expenses, and costs, which are available to prevailing parties under the Act. *Id*. § 20510(c).

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, and in particular under 52 U.S.C. §§ 20507 and 20510(b).

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a defendant resides in this district, and because a substantial part of the events and omissions giving rise to the claims herein occurred in this district.

## PARTIES

4. Plaintiff Don Wagner is a resident of Orange County, an elected member of the Orange County Board of Supervisors, and a candidate for the office of California Secretary of State.

5. Plaintiff the American Independent Party of California ("AI Party") is a qualified political party in California and is devoted to electing candidates who espouse its principles to state and federal office in California.

6. Defendant Shirley N. Weber is the California Secretary of State. The Secretary of State is designated by California law as the chief state elections official responsible for coordination of the state's responsibilities under the NVRA. The Secretary of State also ensures that election laws are enforced and maintains the statewide database of all registered voters. The Secretary of State's Elections Division oversees all federal and state elections within California. Secretary Weber is sued in her official capacity only.

## STATUTORY BACKGROUND

7. Section 8 of the NVRA provides that "each State shall … conduct a general program that makes a reasonable effort to remove … from the official lists of eligible voters" the names of voters who have become ineligible by reason of death or a change of residence. 52 U.S.C. § 20507(a)(4).

8. With respect to voters who have changed residence, Section 8 provides that no registration may be cancelled on that ground unless the registrant either (1) confirms this fact in writing, or (2) fails to timely respond to an address-confirmation notice described by the statute (the "Confirmation Notice"), and fails to vote or contact the registrar for two consecutive general federal elections. 52 U.S.C. § 20507(d)(1).

9. A Confirmation Notice must incorporate a "postage prepaid and pre-addressed return card, sent by forwardable mail," asking the registrant to confirm his or her residence address. *Id.* § 20507(d)(2). If a registrant fails to respond to such a Confirmation Notice, and then fails to vote (or contact the registrar) during a statutory waiting period extending from the date of the notice through the next two general federal elections, the registration is cancelled. *Id.* § 20507(d)(1)(B). These cancellations are mandatory under both federal and California law. *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 767 (2018) ("federal law makes this removal mandatory"); CAL. ELEC. CODE § 2226(b). As set forth further below, this lawsuit is necessary because Defendant does not maintain the required program to make these mandatory removals.

10. Under both federal and California law, a voter registration is referred to as "inactive" when a registrant has failed to respond to a Confirmation Notice and the statutory waiting period has commenced, but has not yet concluded. 11 C.F.R. § 9428.2(d); CAL. ELEC. CODE § 2225(c), (f).

11. Under both federal and California law, a voter with an inactive registration may still vote on election day. 52 U.S.C. § 20507(d)(2)(A); CAL. ELEC. CODE § 2226(c). Accordingly, inactive voters are still registered voters.

12. In June of each odd-numbered year, the U.S. Election Assistance Commission ("EAC") is required by law to report to Congress its findings relating to state voter registration practices. 52 U.S.C. § 20508(a)(3).

13. Federal regulations require states to provide various kinds of NVRA-related data to the EAC for use in its biennial report. 11 C.F.R. § 9428.7.

14. The NVRA provides that "[e]ach State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this chapter." 52 U.S.C. § 20509. California law designates the Secretary of State as this official. CAL. ELEC. CODE § 2402(a).

15. The NVRA affords a private right of action to any "person who is aggrieved by a violation" of the Act. 52 U.S.C. § 20510(b). Ordinarily, a private litigant is required to send notice of a violation to the chief State election official 90 days prior to commencing a lawsuit. *Id.* § 20510(b)(1), (2). However, notice of only 20 days is required "if the violation occurred within 120 days before the date of an election for Federal office," and no notice is required if a "violation occurred within 30 days before the date of an election for Federal office." *Id.* § 20510(b)(2), (3).

**FACTS**

16. On June 30, 2025, the EAC published its biennial, NVRA-related report, entitled ELECTION ADMINISTRATION AND VOTING SURVEY 2024 COMPREHENSIVE REPORT, A REPORT FROM THE U.S. ELECTION ASSISTANCE COMMISSION TO THE 118TH CONGRESS. This report is available online at https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf.

17. Along with this report, the EAC published the responses it received to a voter registration survey it sent to the states. The survey is available online at https://www.eac.gov/sites/default/files/2024-04/2024_EAVS_FINAL_508c.pdf. The chief State election officials, in consultation with their county and local officials, provided and certified their responses to this survey directly to the EAC.

18. State responses to EAC surveys are compiled in datasets available online in

several different software formats, at https://www.eac.gov/research-and-data/studies-and-reports. Responses to the most recent survey were initially published on June 30, 2025, and were subsequently revised, with the most recent revision published on February 12, 2026. These revised responses are available under the heading "EAVS Reports and Materials by Reporting Year," for the year 2024 as "EAVS Datasets Version 2.0 (released February 12, 2026)."

19. The largest number of outdated registrations subject to removal under the NVRA almost always belong to those who have changed residence. For this reason, the largest number of removals under the NVRA are usually made pursuant to Section 8(d)(1)(B), for failing to respond to a Confirmation Notice and failing to vote or otherwise contact the registrar in two consecutive general federal elections.

## I. Defendant's Failure to Comply with NVRA Section 8(d)(1)(B).

### A. California Removes Too Few Registrations Pursuant to Section 8(d)(1)(B).

20. The data Defendant certified to the EAC indicated that ten California counties (Alpine, Imperial, Inyo, Kings, Mariposa, Mendocino, Plumas, San Bernardino, Tehama, and Trinity Counties) reported removing *zero* voter registrations from the list of eligible voters during the period from November 2022 to November 2024 under NVRA Section 8(d)(1)(B)—that is, for failing to respond to a Confirmation Notice and then failing to vote in two consecutive general federal elections. These ten counties reported a combined total of 1,796,437 registrations to the EAC.

21. The data Defendant certified to the EAC indicated that another ten counties (Butte, Colusa, Contra Costa, Glenn, Lassen, Modoc, Santa Cruz, Siskiyou, Sonoma, and Tuolumne Counties) reported removing fewer than 50 registrations each under NVRA Section 8(d)(1)(B) during the period from November 2022 to November 2024. These ten counties reported a combined total of 1,643,921 registrations to the EAC.

22. The 20 counties that removed either zero or fewer than 50 registrations pursuant to NVRA Section 8(d)(1)(B) during the period from November 2022 to

November 2024 reported a combined total of 3,440,358 voter registrations to the EAC. Yet these 20 counties reported removing a grand total of just 218 registrations under that provision during that period.

23. For context, San Diego County, with 2,228,462 total registrations, reported removing 306,033 registrations under Section 8(d)(1)(B) during the period from November 2022 to November 2024.

24. For further context, Mono County, with only 9,175 total registrations, reported removing 574 registrations under Section 8(d)(1)(B) during the period from November 2022.

25. Other California counties reported removing only a fraction of a percent of their total registrations under Section 8(d)(1)(B) during the period from November 2022 to November 2024. For example, Stanislaus County reported removing fewer than one half of one percent of its total registrations under that provision during that period.

26. Sutter County reported removing fewer than one quarter of one percent of its registrations under Section 8(d)(1)(B) during the period from November 2022 to November 2024.

27. Riverside County reported removing fewer than three one hundredths of one percent of its registrations under Section 8(d)(1)(B) during the period from November 2022 to November 2024.

28. Stanislaus, Sutter, and Riverside Counties reported a combined total of 1,770,800 voter registrations to the EAC in November 2024.

29. Sworn interrogatory responses submitted by Defendant Weber's office in *Judicial Watch, Inc. v. Weber,* No. 2:24-3750 (C.D. Cal. 2024) establish that, following the close of the last EAC reporting period in November 2024 through December 9, 2025, 21 California counties (Alameda, Amador, Butte, Calaveras, Del Norte, El Dorado, Glenn, Lassen, Marin, Mendocino, Modoc, Mono, Napa, San Bernardino, Santa Cruz, Shasta, Siskiyou, Stanislaus, Trinity, Tulare, and Yuba Counties) made zero Section 8(d)(1)(B) removals.

30. In those same interrogatory responses, Defendant attested that another six counties made fewer than 30 removals under that provision during that period (Alpine (29 removals), Imperial (1), Lake (1), San Benito (5), San Joaquin (25), and Sutter (17)).

31. According to the Census Bureau, 10.8% of California residents are not living in the same house as they were one year ago.

32. According to the Census Bureau, about 660,000 California residents moved out of state in 2024 (the most recent year for which such data is available), about 690,000 California residents moved out of state in 2023, and about 818,000 California residents moved out of state in 2022.

33. If Defendant was actually conducting a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible because of a change of residence, it would not be possible for ten counties with a combined total of 1,796,437 registrations to cancel zero registrations in a two-year period under Section 8(d)(1)(B).

34. If Defendant was actually conducting a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible because of a change of residence, it would not be possible for another ten counties with a combined total of 1,643,921 registrations to cancel a total of 218 registrations in a two-year period under Section 8(d)(1)(B).

35. If Defendant was actually conducting a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible because of a change of residence, it would not be possible for another three counties with a combined total of 1,770,800 registrations to cancel registrations amounting to minor fractions of one percent of their voter rolls in a two-year period under Section 8(d)(1)(B).

36. The fact that 23 out of California's 58 counties, which reported a combined total of 5,211,158 registrations to the EAC, are cancelling so few registrations under Section 8(d)(1)(B) means that Defendant is not complying with her obligation under the NVRA to be responsible for the coordination of state responsibilities under the Act.

**B. Defendant Is Unable or Unwilling to Comply with Section 8(d)(1)(B) And Lacks Critical Information That Would Allow It to Do So.**

37. California's current program for removing voters guarantees that no California official, either statewide or in the counties, is held accountable for NVRA compliance.

38. Defendant does not send Confirmation Notices to those believed to have moved out of state; does not track how or whether a registrant responded to a Confirmation Notice, independently of what county officials choose to tell it; and does not cancel registrations eligible to be removed under Section 8(d)(1)(B). Rather, Defendant relies entirely on county officials to perform these functions.

39. Defendant is unable to change the status of a voter who has failed to respond to a Confirmation Notice from active to inactive.

40. Defendant is unable to change the status of a voter who meets the criteria of Section 8(d)(1)(B) from inactive to removed.

41. Defendant does not check in advance whether Confirmation Notices contain the statutory language prescribed by Section 8(d)(2).

42. As recently as 2023, some California counties were still sending noncompliant Confirmation Notices. Defendant does not know whether new Confirmation Notices sent in those counties after 2023 comply with Section 8(d)(2).

43. Defendant does not track whether an inactive voter has failed to vote or offer to vote for two general federal elections after receiving a Confirmation Card.

44. Defendant takes no actions to ensure that county officials send Confirmation Notices to registered voters who Defendant believes have moved, other than reminding county officials that they should do so and, after a time, designating such matters as "unresolved."

45. Defendant takes no actions to ensure that county officials change a voter's registration status from active to inactive when that voter fails to respond to a Confirmation Notice.

46. Defendant does not follow up to make sure a county cancels a voter's registration after that voter moves out of state.

47. Defendant has no process to deal with a situation where a county fails to cancel a voter's registration after that voter moves out of state.

48. Agents of Defendant admitted in deposition testimony in *Judicial Watch, Inc. v. Weber* that there are additional measures that they could take to ensure greater compliance with Section 8(d)(1)(B).

49. Defendant's interrogatory responses in *Judicial Watch, Inc. v. Weber* confirm that data concerning how many Confirmation Notices were sent to registered voters in each county and were either received back confirming, updating, or invalidating a registration; were not received back; or were returned as undeliverable, "is not in the Secretary of State's possession, custody, or control, nor is it known by the Secretary of State's employees or agents."

50. In *Judicial Watch, Inc. v. Weber*, Jana Lean testified as Chief of the California Secretary of State's Elections Division that she did not consider familiarity with the NVRA to be necessary for her job.

51. In sum, Defendant claims to have delegated all responsibility for critical steps under Section 8(d)(1)(B)—sending Confirmation Notices, tracking responses to them, inactivating registrants who do not respond, tracking when registrants are eligible for removal, and removing them from the voter roll—to county officials. But if county officials simply fail to do these things, Defendant does nothing beyond continuing, for a time, to remind county officials of what they ought to do. Such reminders, moreover, are all but meaningless given that Defendant does not currently know, because it does not independently track, the disposition of Confirmation Notices, or when inactive registrants have become ineligible; and, as the EAC data set forth above confirms, the reminders are wholly ineffective.

52. The extent to which Defendant claims to have delegated responsibility for NVRA compliance to county officials is not consistent with the text of the NVRA.

53. The fact that Defendant either cannot or does not ensure that Confirmation Notices are sent to voters who have moved, and that voters who fail to respond to a Confirmation Notice are designated inactive, means that there are more registrants on California's voter roll who are listed as active, but who ought to be listed as inactive, or who ought to have been removed already, than there would be if the state maintained its voter rolls in compliance with the NVRA.

54. Defendant's interrogatory responses in *Judicial Watch, Inc. v. Weber* also confirm that California counties are not removing inactive registrations that have been continuously inactive without voting history for two or more consecutive general federal elections. These responses state that, as of December 9, 2025, 873,092 California registrations had been continuously inactive for at least two general federal elections; 326,808 of these had been continuously inactive for at least three general federal elections; 151,202 had been continuously inactive for at least four general federal elections; and 33,922 had been continuously inactive for at least five general federal elections—that is, since before November 5, 2016.

**II. Other Evidence of NVRA Violations.**

55. California's sole source for identifying deceased registrations is the California Department of Public Health. But that data only provides information on California residents who pass away. California does not consult any out-of-state source to identify and remove former California residents who moved to another state without telling California officials, and who then died in that other state. This information from a reliable out-of-state source is necessary to conduct a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible on account of the death of the registrant.

56. Comparing the total number of voter registrations reported to the EAC in each California county to the U.S. Census Bureau's most recent five-year estimates of voting-age citizenry indicates that eighteen California counties have more voter registrations than citizens over the age of eighteen.

57. The fact that so many California counties have registration rates exceeding 100% demonstrates further that Defendant is not conducting a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible because of a change of residence, and that Defendant Weber is not complying with her obligation to be responsible for the coordination of state responsibilities under the NVRA.

**III. The Parties' Correspondence.**

58. On March 23, 2026, Plaintiffs through counsel wrote to Defendant Weber in her capacity as California's chief State election official notifying her of violations of NVRA and of Plaintiffs' intention to file a lawsuit unless those violations were cured within 20 days. The letter expressly stated that it constituted the pre-suit notice prescribed by 52 U.S.C. § 20510.

59. On April 10, 2026, Defendant responded by letter. This letter did not deny any of the facts alleged in Plaintiffs' March 23 letter, but instead argued their weight and legal relevance, contending that "none of the facts you cite constitutes or even supports any reasonable inference of an NVRA violation."

60. Given that this action is filed within 30 days of a federal election, no notice letter is necessary. 52 U.S.C. § 20510(b)(3).

**IV. The Interests of the Plaintiffs.**

**A. Plaintiff Don Wagner.**

61. Plaintiff Don Wagner is currently an elected member of the Orange County Board of Supervisors. He previously served as mayor of Irvine, California, and as a member of California's State Assembly.

62. Mr. Wagner is currently a candidate for the office of California Secretary of State.

63. The primary for California Secretary of State takes place on June 2, 2026, and the general election for this office takes place on November 3, 2026.

64. In the event Mr. Wagner loses either in the primary or general election, he

intends to run again for California Secretary of State in 2030.

65. Mr. Wagner has an interest in the integrity of the election for the office of the California Secretary of State, and in the democratic process by which he may earn or lose the support of the people he seeks to represent.

66. The extent to which California complies with the NVRA in maintaining its voter roll affects the integrity of the election in which Mr. Wagner is participating and the democratic process that includes that election. California mails ballots automatically to all active registrants. Because California maintains such outdated registration lists, many of the ballots mailed in Mr. Wagner's race will be mailed to ineligible registrants.

67. Mr. Wagner's campaign uses California's voter roll in order to identify in-state voters and to contact them and encourage them to learn about Mr. Wagner and to support him by volunteering, organizing, contributing, and voting for him. These voter-contact and election-related activities are the core activities of his campaign.

68. California's centralized voter registration database is the official system of record for voter registration in the state. It maintains all of the voter registration information for all voters in all 58 California counties.

69. Defendant's failure to conduct list maintenance required by the NVRA causes California's voter roll to have many more outdated and ineligible registrations, both on its active and its inactive voter lists, than it otherwise would.

70. California's voter rolls are so notoriously inaccurate that a local, cottage industry has arisen whose purpose is to attempt to "clean" the voter rolls for candidates or parties who wish to contact California voters.

71. Mr. Wagner regularly conducts mailings in his effort to reach voters. Older voters in particular, who tend to have more disposable income, are more likely to contribute and to vote, and tend to support Mr. Wagner, like to receive physical mail and are more likely to respond to it than younger voters.

72. Mr. Wagner hires a mail house to assist with his mailings. The mail house attempts to "clean" the list of names on California's roll in order to avoid sending mail to

bad addresses. The mail house charges a fee to clean the rolls to remove bad addresses.

73. If Mr. Wagner did not pay a mail house to clean the voter roll, he would send more mail to bad addresses—that is, to addresses that are listed on California's voter roll but that belong to registrants who have changed residence.

74. In the runup to the June 2, 2026 primary, Mr. Wagner has paid for or helped to pay for hundreds of thousands of pieces of mail.

75. In the runup to the November 3, 2026 election, Mr. Wagner will pay for or help to pay for additional hundreds of thousands of pieces of mail.

76. Because California's voter roll has so many outdated and ineligible registrations, Mr. Wagner must either pay a fee to clean the roll, or incur costs in the form of misdirected and undeliverable mail. In either case, Mr. Wagner's ability to contact voters is impaired, because doing so is more expensive and less efficient than it would be if the voter roll were better maintained.

77. Because the cost of campaign mailings is higher than it would be if Defendant complied with the NVRA, the average cost associated with each successful voter contact made by Mr. Wagner is higher.

78. Because the cost of campaign mailings is higher than it would be if Defendant complied with the NVRA, Mr. Wagner is able to contact fewer voters with his current resources to encourage them to learn about him and to support him by volunteering, organizing, contributing, and voting for him.

79. The higher cost of campaign mailings is due to Defendant's failure to comply with Section 8(a)(4) of the NVRA, and not to any measures Mr. Wagner has taken in response to that failure.

80. Mr. Wagner's campaign also relies on reaching voters via text ads delivered to smartphones. The advantage of this kind of contact is that it is less expensive than physical mail. Mr. Wagner hires a service to conduct voter contacts through text ads.

81. Mr. Wagner obtains voters' telephone numbers from California's voter roll. However, inaccuracies on the voter roll ensure that many of these numbers belong to voters

who have moved out of state and can no longer vote in California. Because voters typically do not change their cell numbers when they move, the fact that a voter has moved will not be apparent to a service sending text ads.

82. There is no practical way to clean the list to remove telephone numbers belonging to voters who have moved out of state. Any attempt to do so would require cleaning the related street addresses, which would dissipate the cost advantage associated with text ads.

83. Mr. Wagner's ability to reach voters with text ads is impaired because he reaches fewer in-state voters than he would if the voter roll were better maintained.

84. Telephone numbers listed on California's voter roll also allow Mr. Wagner's campaign to send "addressable digital ads" ("ADAs") which are targeted messages sent to smartphones, and to associated websites and television services.

85. As with text ads, there is a cost advantage to ADAs. But, as with text ads, the service that sends ADAs cannot tell if the target has changed physical residence without further, costly research.

86. Mr. Wagner's ability to reach voters with ADAs is impaired because he reaches fewer in-state voters than he would if California's voter roll were better maintained.

**B. Plaintiff AI Party.**

87. Plaintiff AI Party is the third largest political party in California, and a "qualified political party" under state law. As one of six such parties in California, AI Party is entitled to participate in primary elections and in the presidential general election.

88. AI Party and its members and supporters exercise their rights under the First and Fourteenth Amendments to join together and associate in support of their common political beliefs.

89. AI Party does not run candidates under the Party's name. Rather, it endorses candidates in particular elections for both state and federal offices who best represent the views of the Party and its members and supporters.

90. As a party supporting candidates for office, AI Party has an interest in the integrity of the elections for those offices, and in the democratic process by which those candidates may earn or lose the support of the people they seek to represent.

91. AI Party has used, and plans to use again California's voter roll, to identify in-state, active voters and to contact them and encourage them to learn about the candidates it endorses and to support them by volunteering, organizing, contributing, and voting. These voter-contact and election-related activities are among AI Party's core activities.

92. AI Party also plans to use California's list of inactive voters to identify "low propensity" voters, who may support AI Party but whose registrations have become inactive, in order to encourage them, if they are still eligible, to become active voters again.

93. California's voter data includes a field indicating whether a voter is active or inactive. It is easy to search and sort on this field.

94. AI Party intends to engage in specific targeted mailings in advance of the June 2, 2026 California primary elections and in advance of the November 3, 2026 general elections. AI Party is currently engaging in fundraising for this specific purpose.

95. AI Party will hire a service to assist with its mailings. This service will, for a fee, attempt to "clean" the list of names on California's roll in order to avoid sending mail to bad addresses.

96. If AI Party did not pay a service to clean the voter roll, it would send more mail to bad addresses, and receive back more undeliverable mail. At a certain point, moreover, the U.S. Post Office will assess back-charges for undeliverable mail sent to addresses on a bulk list, which AI Party ultimately will have to pay.

97. Because California's voter roll has so many outdated and ineligible registrations, AI Party must either pay a fee to clean the roll, or incur costs associated with misdirected and undeliverable mail, or, in the alternative, forgo a voter mailing altogether because it is simply too expensive. In each case, AI Party's ability to contact voters is impaired.

98. Because the cost of campaign mailings is higher than it would be if Defendant complied with the NVRA, the average cost of a successful voter contact is higher.

99. Because the cost of campaign mailings is higher than it would be if Defendant complied with the NVRA, AI Party is able to contact fewer voters with its current resources to encourage them to learn about the candidates it endorses and to support them by volunteering, organizing, contributing, and voting.

100. The higher cost of campaign mailings is due to Defendant's failure to comply with Section 8(a)(4) of the NVRA, and not to any measures AI Party has taken in response to that failure.

**COUNT I**

**(Violation of Section 8(a)(4) of the NVRA, 52 U.S.C. § 20507(a)(4))**

101. Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

102. Plaintiffs are persons aggrieved by a violation of the NVRA, as set forth in 52 U.S.C. § 20510(b).

103. Defendant has failed to fulfill its obligations under Section 8(a)(4) of the NVRA to conduct a general program that makes a reasonable effort to cancel the registrations of California voters who have become ineligible by reason of a change of residence.

104. Defendant Weber has failed in her duty as California's chief State election official to coordinate State responsibilities under the NVRA.

105. Plaintiffs have suffered and will continue to suffer irreparable injury as a direct result of Defendant's failure to fulfill their obligations under the NVRA.

106. Plaintiffs have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for entry of a judgment:

a. Declaring Defendant to be in violation of Section 8(a)(4) of the NVRA;

b. Permanently enjoining Defendant from violating Section 8(a)(4) of the NVRA;

c. Ordering Defendant to develop and implement a general program that makes a reasonable effort to remove the registrations of ineligible registrants from the voter rolls in California;

d. Ordering Defendant to pay Plaintiffs' reasonable attorney's fees, including litigation expenses and costs; and

e. Awarding Plaintiffs such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: May 20, 2026

JUDICIAL WATCH, INC.

By s/ Eric W. Lee
ERIC W. LEE

BENBROOK LAW GROUP, PC

By s/ Bradley A. Benbrook
BRADLEY A. BENBROOK
STEPHEN M. DUVERNAY
Attorneys for Plaintiffs